Filed 7/22/21  P. v. Marty CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LYKEEM NEFTALI MARTY,<br><br>    Defendant and Appellant. | B306632<br><br>(Los Angeles County<br>Super. Ct. No. TA145980) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ricardo R. Ocampo, Judge.  Affirmed.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Following a jury trial, appellant Lykeem Neftali Marty was convicted of one count of first degree premeditated murder with special circumstances (Pen. Code,[1] §§ 187, subd. (a), 190.2, subds. (a)(21), (a)(22)), three counts of attempted murder (§§ 664, 187, subd. (a)), one count of shooting at an occupied vehicle (§ 246), and one count of shooting at an inhabited dwelling (§ 246).  The jury also found true firearm enhancement (§ 12022.53, subds. (d), (e)(1)) and gang enhancement (§ 186.22, subd. (b)) allegations.  On appeal, Marty argues the trial court (1) violated his Sixth Amendment right of confrontation by admitting testimonial hearsay; (2) erred in instructing the jury on the defense of duress; and (3) imposed certain fines and assessments at sentencing without determining his ability to pay.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     The Evidence at Trial

This case arises out of a series of drive-by shootings committed by members of the Grape Street Crips.  Marty and six codefendants were charged with murder, attempted murder, and other related crimes in connection with two of the shootings.  Marty and codefendant Dushawne Smith were jointly tried on the charges before separate juries.  Two other codefendants, Karnell Lawson and Deanthony Bradford, testified against Marty and Smith as part of plea agreements for reduced sentences.[2]

---

[1] Unless otherwise stated, all statutory references are to the Penal Code.

[2] Under their respective plea agreements, Lawson and Bradford would each receive reduced sentences in all cases pending against them in exchange for their truthful testimony.  Lawson, who was 18 years old at the time of the shootings, would

The Grape Street Crips are a large gang in South Los Angeles. One of the gang's main rivals are the Bounty Hunter Bloods. Nickerson Gardens is a housing project located in an area controlled by the Bounty Hunter Bloods. Jordan Downs is another housing project about a mile away, and is a stronghold of the Grape Street Crips. A few weeks before the shootings in this case, a high-ranking member of the Grape Street Crips was murdered by a member of the rival Bounty Hunter Bloods.

On the night of August 3, 2016, a group of Grape Street gang members, including Marty, Smith, Lawson, and Bradford, gathered near Jordan Downs. Vernon Williams, a leader and shot caller for the gang, came up with a plan to retaliate against the Bounty Hunters by shooting and killing one or more of their members. At Williams's direction, the group got into three cars and stayed in communication using their cell phones. Williams and Bradford were in a Mercedes, the lead car, and looked for potential targets. Three other men were in a Lexus, the decoy car, that would try to draw the attention of any police officers responding to the shooting. Marty, Smith, and Lawson were in a Nissan, the designated shooting car and the only one containing firearms. Marty drove the Nissan, and Smith and Lawson sat in the backseat. All three occupants of the Nissan were armed.

The group first drove in a caravan to the Howard Hughes Center in Culver City where Williams believed they would find Bounty Hunter Bloods. Williams directed the group to the driver of a Maserati whom he identified as a rival gang member. Marty,

be sentenced to a total determinate term of 28 years, making him eligible for parole in 13 years. Bradford, who was 19 years old at the time of the shootings, would be sentenced to a nine-year term.

Smith, and Lawson all shot at the Maserati's occupants. The driver of the Maserati was treated for multiple gunshot wounds.

Following this shooting, the group retrieved an AK-47 assault rifle. Because Williams was not satisfied with the shooting, all three cars then headed to Nickerson Gardens searching for another target. After scouting the area a few times, Marty stopped the Nissan near a field where a group of people had congregated. Lawson fired a pistol at the group until the chamber was empty. Several bullets hit a nearby home. Smith, who had been given the AK-47, struggled to cock the rifle and was unable to fire any shots. No injuries were reported as a result of that shooting.

The caravan of cars next went to a nearby park. Williams told the group that they were not done because no one had been killed. After Williams helped Smith cock the AK-47, the group headed toward a gas station across the street from Nickerson Gardens. From the Mercedes, Williams or Bradford identified the driver of a white Chrysler at the gas station as another potential target.

Cordero Dougal was the driver of the Chrysler and his girlfriend, Ijeoma Chukwudi, was also in the car. A third person, Paul Richmond, was standing nearby. Smith said, "[W]hat's up, cuz?" and then immediately opened fire with the AK-47, killing Dougal and wounding both Chukwudi and Richmond.

Shell casings were recovered from the scenes of all three shootings. Ballistics testing showed the casings found at the Howard Hughes Center and those found at Nickerson Gardens were fired from the same gun. A casing recovered from the gas station was consistent with the type of ammunition often used in AK-47 assault rifles.

The police also obtained security camera footage of the Nickerson Gardens and gas station shootings. The footage of the Nickerson Gardens shooting captured a Nissan, Mercedes, and Lexus driving through the area and the Nissan then speeding away as a crowd of people suddenly fled. The footage of the gas station shooting showed the same three cars driving in tandem on a nearby street and the Nissan pulling into the station with the barrel of a rifle pointed out the window. Immediately after the shooting, the Nissan left the gas station and drove away from the area followed by the two other vehicles.

At trial, the prosecution's gang expert opined that, based on a hypothetical drawn from the facts of the case, the Nickerson Gardens and gas station shootings would have been committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further or assist in criminal conduct by its members.

## II. Jury Verdict and Sentencing

The jury found Marty guilty on all counts, and found true the special circumstance allegations that the murder of Dougal was committed by discharging a firearm from a vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)), and to further the activities of a criminal street gang in which the shooter was an active participant (§ 190.2, subd. (a)(22)). The jury also found true the enhancement allegations that a principal personally and intentionally discharged a firearm causing death or great bodily injury (§ 12022.53, subds. (d), (e)(1)), and that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)).

The trial court sentenced Marty to a term of life without the possibility of parole plus 25 years to life for the murder of Dougal; consecutive life terms plus 25 years to life for the attempted murders of Chukwudi and Richmond; a consecutive life term plus 20 years to life for the attempted murder of an unnamed victim in the Nickerson Gardens shooting; and a consecutive term of 15 years to life for shooting at an inhabited dwelling.  The court stayed the sentence for shooting at an occupied vehicle pursuant to section 654.

Marty filed a timely appeal.

## DISCUSSION

### I. Admission of Chukwudi's Extrajudicial Statement About the Grape Street Crips

On appeal, Marty asserts the trial court erred in admitting evidence that, as Chukwudi was exiting the courtroom following her trial testimony, she said, "Fuck Fake Street," a derogatory reference to the Grape Street Crips.  Marty argues admission of the statement violated his Sixth Amendment right of confrontation because it constituted testimonial hearsay.

#### A. *Relevant Proceedings*

At trial, Chukwudi was an uncooperative witness and refused to provide any substantive testimony.  When the trial court excused Chukwudi as a witness, the following exchange took place in open court in the presence of the juries:

"The court:  Subject to recall, Ms. Chukwudi, you are now excused.

"[Chukwudi]:  No.  I'm going to ask my questions now.  So I'm excused now?  You just told me I can ask questions.  So what's their name?

6

"The court: You can ask your questions in a different environment.

"[Chukwudi]: What's their—so now I'm excused. Okay.

"The court: Bailiff—

"[Chukwudi]: So now I can't get no questions. But y'all are going to sit up here and question me all fuckin' day.

"The court: Ma'am, you can ask the questions of them at another time.

"[Chukwudi]: No. I might as well walk out this way now.

"The bailiff: You can go that way.

"[Chukwudi]: Shit, get the fuck out my way.

"The bailiff: Hey, watch your language, though.

"[Chukwudi]: I ain't got to watch shit. I need faces too. I need families to keep in touch too. Fuck Fake Street.

"The court: Ready with your next witness? People may call their next witness."

At that time, neither the court nor counsel commented on Chukwudi's outburst. The following court day, however, the prosecutor sought to introduce Chukwudi's "Fuck Fake Street" comment into evidence. Marty's counsel objected, stating, "I think it was nonresponsive and I think it should be stricken. It's out of context, unless we want to bring her back in and cross-examine her about it. I think it's irrelevant." Smith's counsel joined in the objection, adding, "The other problem that I see is if we get it introduced, then the next step is what's the admonition to the jury . . . going to be regarding how they should view it?"

The trial court noted that, while Chukwudi's remark had been recorded by the court reporter, it was not made on the witness stand, and thus, was an out-of-court statement for hearsay purposes. However, the court confirmed with the

7

prosecutor that the statement was not being offered for the truth of the matter asserted, but rather, it "just goes to her state of mind."  The court stated, "So based on that, I think it would be a reflection of her state of mind of what she feels about Grape Street because I understand that that term . . . it's a derogatory statement against Grape Street, which would also impeach her testimony that she doesn't know anything about gangs or anything about—so that would be the offer of proof; correct . . . ?"  The prosecutor agreed.

The trial court ruled that it would allow introduction of the statement through the lead detective in the case, who had heard Chukwudi make the statement as she was leaving the courtroom.  The court also indicated that it would instruct the jury that the statement was being offered as evidence of Chukwudi's state of mind and not for any other purpose.

During the detective's testimony, the prosecutor asked him about Chukwudi's statement.  The detective testified that the last thing Chukwudi said as she was leaving the courtroom was "Fuck Fake Street."  He further testified that Fake Street was "a term that the rivals of Grape Street Crips use as a sign of disrespect."  Later, the prosecution's gang expert also explained that Fake Street was a derogatory term used by rivals to describe the Grape Street Crips.  The trial court never instructed the jury about the limited purpose for which Chukwudi's statement was admitted, nor was any such instruction requested by the prosecution or the defense.

## B.    *Governing Legal Principles*

A trial court has broad discretion in ruling on the admissibility of evidence.  (*People v. Fayed* (2020) 9 Cal.5th 147, 189.)  " 'We review a trial court's decision to admit or exclude

evidence 'for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." ' " (*People v. Young* (2019) 7 Cal.5th 905, 931; accord, *People v. Caro* (2019) 7 Cal.5th 463, 503 [we "review evidentiary rulings, including ultimate rulings on whether evidence should be excluded as hearsay, for abuse of discretion"].)

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless subject to an exception, hearsay evidence is inadmissible. (*Id*., subd. (b).) There are two theories under which out-of-court statements of a declarant's state of mind can be admitted: "(1) as hearsay under the Evidence Code section 1250 exception for the declarant's present state of mind, and (2) as nonhearsay circumstantial evidence of a declarant's state of mind." (*People v. Clark* (2016) 63 Cal.4th 522, 590–591, fn. omitted.) Under the second theory, a statement which does not directly declare the speaker's mental or emotional state, but is merely circumstantial evidence of it, is not hearsay. (*People v. Dalton* (2019) 7 Cal.5th 166, 232; *People v. Cox* (2003) 30 Cal.4th 916, 962, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Such evidence " 'is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind.' " (*Cox*, at p. 962.)

In *Crawford v. Washington* (2004) 541 U.S. 36, 53–54, the United States Supreme Court held that the Sixth Amendment right of confrontation bars the admission of a witness's

9

testimonial hearsay unless the witness is unavailable, and the defendant had a prior opportunity for cross-examination.  In general, a witness's "hearsay statement is testimonial if made 'with a primary purpose of creating an out-of-court substitute for trial testimony.' "  (*People v. Fayed*, *supra*, 9 Cal.5th at p. 168, quoting *Michigan v. Bryant* (2011) 562 U.S. 344, 358.)  Only statements that are both hearsay and testimonial are subject to the confrontation clause.  (*Davis v. Washington* (2006) 547 U.S. 813, 821; *Fayed*, at p. 168.)  The confrontation clause does not "bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted," that is, for nonhearsay purposes.  (*Crawford*, at p. 59, fn. 9.)

### C. *The Trial Court Did Not Err in Admitting Evidence of Chukwudi's Statement*

Marty contends Chukwudi's derogatory comment about the Grape Street Crips constituted testimonial hearsay in violation of his Sixth Amendment right of confrontation because Chukwudi made the statement in open court in the presence of the juries, and for the purpose of proving Marty's guilt of the gang-related crimes.  As the Attorney General asserts, Marty forfeited his confrontation clause claim by failing to raise it in the trial court. (See *People v. Arredondo* (2019) 8 Cal.5th 694, 710 [defendant "forfeited his claim under the confrontation clause by failing to object at trial"]; *People v. Redd* (2010) 48 Cal.4th 691, 730 [although defendant objected to testimony on hearsay grounds, he "did not raise an objection below based upon the confrontation

10

clause, and therefore has forfeited this claim"].) Even if not forfeited, however, the claim fails on the merits.[3]

As the trial court correctly ruled, Chukwudi's "Fuck Fake Street" statement was not hearsay because it was not offered to prove the truth of the matter asserted. Rather, it was offered to show Chukwudi's state of mind as she was exiting the courtroom in an agitated state after being excused from the witness stand. Chukwudi's state of mind was relevant to her credibility as a witness because, throughout her trial testimony, she refused to provide any substantive responses to the questions asked by both the prosecution and the defense. Instead, Chukwudi repeatedly answered that she did not know or could not recall in response to the questions posed, including those related to whether she feared for her safety if she testified truthfully. At one point, Chukwudi stated, "Let's just let the streets handle it. That's all. I don't got nothing else to say." She also stated that forcing her to testify was "endangering a lot of people's [lives] as far as the streets," but refused to elaborate further. Because Chukwudi's disparaging remark about the gang accused of

_____

[3] The Attorney General also argues that Marty forfeited any claim that Chukwudi's statement was inadmissible hearsay because his trial counsel only objected to the statement on the grounds that it was nonresponsive and irrelevant. However, the trial court immediately responded to the defense objection by addressing whether the statement was hearsay, and ruled that it was not hearsay because it was not being offered for its truth. Under these circumstances, there was no forfeiture of a state law hearsay claim. (*People v. Anderson* (2018) 5 Cal.5th 372, 403 [no forfeiture of hearsay claim where defendant objected to admission of evidence on other grounds but "the court anticipated a hearsay objection and ruled on it"].)

11

committing the shootings was offered as circumstantial evidence of her then existing state of mind, its admission did not violate California hearsay law.

Admission of Chukwudi's statement also did not violate Marty's Sixth Amendment right of confrontation. "*Crawford* made clear that there are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes." (*People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 6; accord, *People v. Fayed*, *supra*, 9 Cal.5th at p. 168 ["admission of *nonhearsay* statements . . . 'raises no Confrontation Clause concerns' "].) Because Chukwudi's statement was admitted for the nonhearsay purpose of showing her state of mind at trial after she refused to answer questions, it did not run afoul of the confrontation clause. Moreover, the statement was not testimonial within the meaning of *Crawford*. To be testimonial, " 'the out-of-court statement must have been made with some degree of formality or solemnity,' "and "the primary purpose of the statement must 'pertain[ ] in some fashion to a criminal prosecution.' " (*People v. Leon* (2015) 61 Cal.4th 569, 603.) While Chukwudi's "Fuck Fake Street" remark was captured on the record by the court reporter, it was made after she had already been excused as a witness and was being escorted from the courtroom. Chukwudi did not make the disparaging comment with any degree of formality or solemnity, nor is there anything in the record to suggest that her primary purpose was related to the pending criminal prosecution. Instead, it appears the statement was a spontaneous outburst that was not directed at anyone in particular, and was simply intended to serve as an insult of the Grape Street Crips. Chukwudi's statement

12

accordingly was neither testimonial nor hearsay, and the trial court did not err in admitting it.

Marty argues that, even if the evidence of Chukwudi's statement was offered for a nonhearsay purpose, the jury was allowed to consider it for the truth of the matter asserted because the trial court failed to give a limiting instruction. "Absent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted." (*People v. Cowan* (2010) 50 Cal.4th 401, 479; see Evid. Code, § 355 ["When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"].) Although the trial court had indicated that it would instruct the jury about the limited purpose for which Chukwudi's statement was admitted, it did not did so. However, defense counsel did not remind the court of its intended limiting instruction when the detective testified about the statement or at any other time. Nor did defense counsel submit a proposed instruction about the limited purpose of the statement for the court's consideration. Because the defense did not request a limiting instruction at the appropriate time, the court had no sua sponte duty to give one. (*Cowan*, at p. 480 [although trial court agreed to give limiting instruction, it did not err in failing to do so where "defense counsel did not remind the court that it had agreed to give a limiting instruction either at the time the testimony was read, or when discussing jury instructions"]; *People v. Freeman* (1994) 8 Cal.4th 450, 495 [defendant forfeited claim that trial court erred in failing to comply with offer to instruct jury on limited purpose of proffered evidence because

13

defendant "did not . . . request such an instruction" and court had "no sua sponte duty to so instruct"].)

In any event, even assuming the trial court erred in failing to instruct the jury on the limited purpose for which Chukwudi's statement was admitted, any such error was harmless because it is not reasonably probable that Marty would have obtained a more favorable result had the instruction been given. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1042 [applying state law harmless error standard to failure to give limiting instruction]; *People v. Williams* (2013) 58 Cal.4th 197, 271 [same].) There was overwhelming evidence that Marty aided and abetted the two gang-related shootings that gave rise to the charges in this case. Both Lawson and Bradford testified that Marty was the driver of the Nissan in the shootings that took place at Nickerson Gardens and the nearby gas station. They also testified that the purpose of the shootings was to seek revenge against the rival Bounty Hunter Bloods for the prior killing of a fellow member of the Grape Street Crips. The surveillance video of the shootings captured the Nissan at the scene of each crime, and was largely consistent with the accounts provided by Lawson and Bradford. In addition, the testimony about Chukwudi's "Fuck Fake Street" comment was brief and limited in scope. The prosecutor also made clear in his closing argument that Chukwudi's statement was merely offered to show that "in her mind, this is a gang case, and it's scary to come testify in a gang case." Given the totality of the evidence, Marty has failed to show prejudicial error in the admission of Chukwudi's statement.

## II. Jury Instruction on Duress

Marty contends the trial court violated his constitutional right to due process and a reliable verdict by refusing to instruct

14

the jury that duress may negate premeditation and deliberation for the crimes of murder and attempted murder.

## A. *Relevant Proceedings*

At trial, both Lawson and Bradford testified about the Grape Street gang's practice of disciplining its own members by subjecting them to beatings and other acts of violence. Lawson recounted that Smith and Marty were subject to discipline from the gang because they had been involved in a prior altercation with Lawson, and as a result, the men had to prove themselves by participating in the shootings. Bradford similarly testified that Smith, Marty, and Lawson each "got [their] card pulled" for not following the rules of the gang, and were "trying to redeem themselves" by agreeing to be placed in the shooting car.

Based on the evidence that Smith and Marty may have acted under the fear of being disciplined by their fellow gang members, the trial court instructed the jury on the defense of duress with a modified version of CALJIC No. 4.40: "A person is not guilty of a crime other than murder or attempted murder when he engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances: [¶] 1. Where the threats and menaces are such that they would cause a reasonable person to fear that his life would be in immediate danger if he did not engage in the conduct charged, and [¶] 2. If this person then actually believed that his life was so endangered. [¶] This rule does not apply to threats, menaces, and fear of future danger to his life, nor does it apply to the crimes of murder or attempted murder."

The trial court overruled Marty's objection to CALJIC No. 4.40, and denied Smith's request that the instruction be further modified to provide that "duress may not be a defense to

15

murder[,] but it may be a defense to premeditation or implied malice." Citing *People v. Landry* (2016) 2 Cal.5th 52 (*Landry*) and *People v. Hinton* (2006) 37 Cal.4th 839 (*Hinton*), the court explained that duress does not negate malice, although it may negate premeditation to reduce a murder from first to second degree. The court concluded this concept was adequately covered by CALJIC Nos. 8.20 and 8.30, the standard instructions defining first degree premeditated murder and second degree unpremeditated murder.

**B.** ***The Trial Court Properly Instructed the Jury on the Defense of Duress***

Marty argues the trial court erred in refusing to further modify CALJIC No. 4.40 to provide that duress may negate premeditation because the proposed modification was an accurate statement of the law and supported by the evidence. He further asserts the instructions given by the court failed to adequately address the defense of duress because they did not inform the jury that duress could negate the elements of premeditation and deliberation. We conclude this claim lacks merit.

"The trial court must instruct the jury 'on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case.'" (*People v. Anderson, supra*, 5 Cal.5th at p. 413.) A defendant also has a right to a pinpoint instruction on the theory of the defense. (*People v. Homick* (2012) 55 Cal.4th 816, 890.) The court, however, may properly refuse a defense instruction if it incorrectly states the law, is argumentative, duplicative, or potentially confusing, or if it is not supported by substantial evidence. (*People v. Bivert* (2011) 52 Cal.4th 96, 120.)

16

" 'The defense of duress is available to defendants who commit crimes, except murder, "under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." ' " (*People v. Powell* (2018) 6 Cal.5th 136, 164; see § 26.) " '[D]uress is not a defense to *any* murder' [citation] and, in particular, does not negate malice." (*Hinton*, *supra*, 37 Cal.4th at pp. 882–883; accord, *Landry*, *supra*, 2 Cal.5th at p. 91 ["duress is not a defense to murder, nor does duress reduce murder to manslaughter"].) Although duress does not categorically negate premeditation and deliberation, if a person obeys an order to kill without reflection, a jury might find no premeditation and thus convict only of second degree murder. (*Hinton*, at p. 884.) However, "this circumstance is not due to a special doctrine of duress but to the legal requirements of first degree murder." (*People v. Anderson* (2002) 28 Cal.4th 767, 784.) A "killing 'upon a sudden heat of passion or other condition precluding the idea of deliberation' would not be premeditated first degree murder." *(Ibid*., italics omitted.) But "a malicious, premeditated killing, even under duress, is first degree murder." (*Ibid*.)

In *Hinton*, *supra*, 37 Cal.4th at pages 847 to 848, for instance, the defendant was convicted of first degree murder with special circumstances. In addition to giving CALJIC No. 4.40 on duress, the trial court instructed the jury that when " 'a person commits a crime punishable with death, it is not a defense that he committed the act or made the omission under threats or menaces of immediate death or bodily harm.' " (*Id.* at p. 882.) On appeal, the defendant argued the instructions erroneously prohibited the jury from considering whether threats to his life could negate the mental state elements of first degree murder.

17

(*Ibid*.)  In concluding there was no instructional error, the Supreme Court explained that the instructions "correctly informed the jury that threats and menace do not constitute a *defense* to murder." (*Id*. at p. 883.)  The court also noted that "[n]othing in these instructions barred the jury from considering whether these threats—or any other facts—prevented defendant from premeditating and deliberating." (*Ibid*.)

Here, as in *Hinton*, the trial court properly instructed the jury on duress.  The version of CALJIC No. 4.40 given by the trial court correctly informed the jury that threats and menace do not constitute a defense to murder or attempted murder.  In addition, CALJIC Nos. 8.20 and 8.30 accurately defined the mental state elements of first degree premeditated murder and second degree unpremeditated murder.  There was nothing in the instructions that precluded the jury from considering whether Marty acted without premeditation and deliberation when he aided and abetted his confederates in committing the Nickerson Gardens and gas station shootings.  The jury was thus free to determine whether any threats made to the defendants on the night of the shootings caused them to obey their gang's order to kill without reflection, thereby negating the mental state required for premeditated murder.

Marty nevertheless asserts that CALJIC Nos. 8.20 and 8.30 did not sufficiently inform the jury that duress could negate premeditation and deliberation.  The Supreme Court rejected a similar argument in *Landry* because CALJIC No. 8.20 (deliberate and premeditated murder) instructs the jury that a killing upon a sudden heat of passion or other condition precluding the idea of deliberation is not first degree premediated murder.  (*Landry*, *supra*, 2 Cal.5th at pp. 93–94.)  In this case, the jury was properly

18

instructed with CALJIC Nos. 8.20 and 8.30, and found Marty guilty of first degree premediated murder and attempted premediated murder. There was no instructional error.

### III. Imposition of Restitution Fine and Assessments

At Marty's July 10, 2020 sentencing hearing, the trial court ordered him to pay a $6,000 restitution fine (§ 1202.4), $240 in court operations assessments (§ 1465.8), and $180 in court facilities assessments (Gov. Code, § 70373). Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, Marty argues the imposition of these fines and fees without determining his ability to pay violated his constitutional right to due process and equal protection of the law.

Decided in January 2019, *People v. Dueñas*, *supra*, 30 Cal.App.5th at page 1164, held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before imposing court facilities or court operations assessments or a restitution fine. Although Marty's sentencing hearing was held 18 months after the *Dueñas* decision, he did not object to the imposed restitution fine or assessments in the trial court. Typically, a defendant who fails to object to the imposition of fines, fees, and assessments at sentencing forfeits the right to challenge them on appeal. (See, e.g., *People v. Aguilar* (2015) 60 Cal.4th 862, 864; *People v. Trujillo* (2015) 60 Cal.4th 850, 856–859; *People v. McCullough* (2013) 56 Cal.4th 589, 596–597.) Applying this general rule, we conclude Marty forfeited his ability-to-pay claim in this case.

Marty asserts his claim was not forfeited because there is a split among appellate courts as to whether an ability-to-pay challenge is forfeited by the failure to raise it in the trial court.

19

(Compare *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 [claim not forfeited]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 138 [same] with *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155 [claim forfeited]; *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464 [same].) The cases on which Marty relies, however, all involved sentencing proceedings that took place before *Dueñas* was decided, and are therefore inapplicable here.

Marty also attempts to excuse his failure to object to the imposed fines and fees by arguing that "there was not enough time realistically for the practicing trial bar, and perhaps trial courts, to be informed of the change in the law brought about by *Dueñas*'[s] holding." Given the significant constitutional principles announced in *Dueñas* and resulting conflict among appellate courts regarding its propriety, we disagree. Moreover, irrespective of the holding in *Dueñas*, Marty had an opportunity to object to the $6,000 restitution fine based on an inability to pay because the statute authorizing the fine expressly permitted such a challenge. (See § 1202.4,subds. (b)(1), (c) [defendant's inability to pay may be considered in increasing the restitution fine above the $300 statutory minimum]; *id.*, subd. (d) [defendant bears the burden of demonstrating his or her inability to pay a restitution fine in excess of the statutory minimum].) Marty never claimed he was unable to pay the amount of the restitution fine imposed. Marty's failure to object to the $6,000 restitution fine at sentencing leaves no doubt that he would not have objected to the $240 in court operations assessments and the $180 in court facilities assessments, regardless of whether he was aware of the constitutional principles articulated in *Dueñas*. (See *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 ["if [defendant] chose

20

not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees"].)

Marty further contends the forfeiture rule should not apply in this case because his claim raises a pure question of law based on undisputed facts, and it would have been futile to object to the imposed fines and fees in the trial court. This contention likewise fails. In challenging the imposition of the restitution fine and assessments, Marty requests a factual determination of his alleged inability to pay based on facts that are not conclusively established by the record. The fact that Marty was represented at trial by a public defender, and is represented on appeal by appointed counsel, is insufficient, standing alone, to establish indigency. (See *People v. Frandsen*, *supra*, 33 Cal.App.5th at p. 1153 [rejecting defendant's request to determine his alleged inability to pay fines and fees "based on a record that contains nothing more than his reliance on appointed counsel at trial"].) Further, a timely objection to the restitution fine based on an inability to pay would not have been futile under governing law, which as discussed, clearly contemplates such an objection. (§ 1202.4, subd. (d); see *People v. Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033.) Because Marty failed to object to the imposed fines and fees in the trial court, he has forfeited this claim on appeal.

21

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.


KALRA, J.[*]

We concur:


EDMON, P. J.


LAVIN, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.